UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
VAAD L'HAFOTZAS SICHOS, INC.,

    Plaintiff/Counterclaim Defendant,

-against-

KEHOT PUBLICATION SOCIETY, a
division of MERKOS L'INYONEI
CHINUCH, INC.

    Defendant/Counterclaim
    Plaintiff/Third-Party Plaintiff,

-against-

ZALMAN CHANIN,

    Third-Party Defendant.
--------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 10-CV-4976 (FB) (JO)

*Appearances*:
*For Vaad L'Hafotzas Sichos, Inc. and Zalman Chanin*:
PAUL FIELDS, ESQ.
KARIN SEGALL, ESQ.
YUVAL H. MARCUS, ESQ.
Leason Ellis LLP
One Barker, Avenue, Fifth Floor
White Plains, New York 10601

*For Kehot Publication Society:*
J. CHRISTOPHER JENSEN, ESQ.
Cowan, Liebowitz & Latman, P.C.
1133 Avenue of the Americas
New York, New York 10036-6799

**BLOCK, Senior District Judge:**

        In 2010, the United States Patent and Trademark Office ("PTO") approved the application of Merkos L'Inyonei Chinuch, Inc. ("Merkos") to register a trademark for use on books and other publications distributed principally within the Lubavitcher community of

Hasidic Jews. *See Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y*, 2010 WL 3597243 (TTAB Aug. 30, 2010). Vaad L'Hafotzas Sichos ("Vaad") opposed the application and seeks judicial review of the PTO's decision. Vaad moves for a summary judgment cancelling the registration; Merkos cross-moves for a summary judgment affirming it.

In addition to defending the PTO's decision, Merkos counterclaims for infringement, dilution and unfair competition; it makes the same claims against Zalman Chanin ("Chanin"), Vaad's president and principal owner, and seeks both injunctive and monetary relief. On those claims, Vaad and Chanin have moved for summary judgment.

For the following reasons, the Court affirms the PTO's decision and denies Vaad and Chanin's motion for summary judgment on Merkos's counterclaims.

**I**

The Lubavitcher community has its roots in Tsarist Russia. In the midst of World War II, its then-leader—or Rebbe—Rabbi Joseph Isaac Schneersohn ("the Previous Rebbe"), emigrated to the United States. Today, the movement is headquartered in Crown Heights, Brooklyn.

Shortly after arriving in the United States, the Previous Rebbe founded the Kehot Publication Society ("Kehot"). A year later, he founded Merkos to provide broader educational services to the Lubavitcher community. The Previous Rebbe installed his son-in-law, Rabbi Menachem Mendel Schneerson ("the Rebbe"), as Merkos's president.

At its first meeting in 1942, Merkos's board of directors resolved to take over direction of Kehot, an unincorporated entity. The resolution reads as follows:

Whereas "KEHOT" has been engaged in the publication of

> literature of great value both in the religious and pedagogic field, and
>
> Whereas it appears that such activity would well fit into the program of MERKOS L'INYONEI CHINUCH, INC. and it would be for the best interests of MERKOS L'INYONEI CHINUCH, INC. to assume and adopt the continuance of these publications hereafter, and
>
> Whereas Rabbi Joseph I. Schneersohn has signified his willingness to and does give and assign to MERKOS L'INYONEI CHINUCH, INC. the right to use the trade names of "KEHOT" and "KEHOT PUBLICATION SOCIETY" in publishing, advertising and distributing religious and pedagogic literature,
>
> Now, therefore, it is resolved that the proposal as set forth above be and the same hereby is approved and the Executive Committee is directed to carry out the terms of this resolution in all respects.

*Vaad*, 2010 WL 3597243, at *5.

The resolution did not expressly mention the Kehot logo. That logo was first used in 1941, the same year Kehot was founded. At the center of the logo is a circle containing the word *Kehot* in Hebrew (קה"ת). Kehot is an acronym for קרני הוד תורה (*Karnei Hod Torah*), which means "rays of the Torah's glory" or, with some poetic license, "Torah is a majestic crown." That phrase runs around the top of the circle; around the bottom runs ליובאוויטש (*Lubavitch*). Surmounting everything are the words הוצאת ספרים (*Hotzaat Seforim*)—"book press" or, more loosely, "publishing house." In 1960, Merkos registered the logo as a trademark under New York law.

During the Previous Rebbe's tenure, several entities apart from Kehot used the logo. Some, like Kehot, were part of the movement's umbrella organization; others were independent. All use of the logo was contingent on the Previous Rebbe's approval. This

3

practice continued when the Rebbe succeeded his father-in-law in 1951.

In 1958, and again in 1962, the independent Lubavitch Youth Organization published a weekly pamphlet containing the Rebbe's *sichos* (talks or sermons). Vaad was formed in 1967 to provide the same service in a more regular manner. Indeed, Vaad's full name means "Council for Distribution of the Sichos."

Thus, between 1967 and 1994, Vaad submitted its weekly pamphlets to the Rebbe. Upon receiving his approval, Vaad would publish and distribute the pamphlets under the Kehot logo. In addition, the Rebbe put Vaad in charge of some of Kehot's printing operations in 1979.

The Rebbe's failing health and eventual passing in 1994 precipitated a leadership crisis in the Lubavitcher community. Rabbi Yehuda Krinsky took over direction of Kehot and Merkos, but no one acceded to the position of Rebbe. Instead, the movement has been run in accordance with the Rebbe's directives. As the present case attests, not everyone agrees as to what those directives were. *See also Merkos L'Inyonei Chinuch, Inc. v. Sharf*, 172 F. Supp. 2d 383, 384 (E.D.N.Y. 2001) ("Sharf and the other putative defendants hold the heartfelt belief that, notwithstanding his physical passing in 1994, the Rebbe still lives. Those authorized to act on behalf of Merkos in respect to the copyrighted volumes of the Rebbe's letters do not share this belief . . . . ").

In January 1994, Rabbi Krinsky sent Vaad a letter purporting to terminate its relationship with Merkos and Kehot. The letter demanded that Vaad stop using the Kehot logo. Notwithstanding the letter, Vaad has continued to publish numerous works under the logo; the works contain the *sichos* and other content previously approved by the Rebbe.

4

In September 2001, Merkos applied to the PTO to register the logo as a trademark for use on "books, magazines, charts, maps, and photographs on a variety of aspects of Jewish life." *Vaad*, 2010 WL 3597243, at *1. Vaad timely opposed the application. The matter was referred to the PTO's Trademark Trial and Appeal Board ("TTAB"), which dismissed the opposition in a written opinion. *See id.* at *9. This action followed.

## II

The Lanham Act gives jurisdiction over appeals from decisions of the PTO to the Federal Circuit. *See* 15 U.S.C. § 1071(a)(1). However, it also allows an aggrieved party to bring a civil action in district court. *See id.* § 1071(b)(1). In the latter case, the district court is empowered to adjudge that a trademark should be registered or, conversely, that a registration granted by the PTO should be canceled. *See id.* The administrative record is admissible, but the parties are free to adduce other evidence. *See id.* § 1071(b)(3) ("In suits brought hereunder, the record in the United States Patent and Trademark Office shall be admitted on motion of any party . . . , without prejudice to the right of any party to take further testimony."); *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 853 (2d Cir. 1988) ("The record made in the Patent and Trademark Office is admitted in evidence, but the factfinding of that office is not conclusive, nor is the court's consideration limited to that record." (internal quotation marks and citation omitted)).

The PTO's conclusions of law are reviewed *de novo. See In re Thrifty, Inc.*, 274 F.3d 1349, 1351 (Fed. Cir. 2001). Its findings of fact, by contrast, are reviewed under the "substantial evidence" standard, under which a court must accept the findings if a "'reasonable mind might accept' a particular evidentiary record as 'adequate to support a

5

conclusion.'" *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quoting *Consolidation Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Matters not raised in the administrative proceeding do not, of course, receive any deference.

Vaad offers two reasons why the PTO's registration of the Kehot logo should be canceled. Those reasons frame the following questions, which the Court answers in turn.

**A. Who owns the Kehot logo?**

In its opposition to registration, Vaad contended that the owner of the Kehot logo was the Rebbe, and not Merkos. The TTAB rejected the argument, finding that "Merkos is the owner of the KEHOT logo and is the proper applicant for this trademark." *Vaad*, 2010 WL 3597243, at *7. Vaad argues that this finding was not supported by substantial evidence.

The principal evidence of ownership is the transfer of the right to use the trade names "Kehot" and "Kehot Publication Society" to Merkos. That evidence is undisputed.

Vaad points out, however, that the transfer did not explicitly mention the right to use the logo. That omission is of no consequence because courts and commentators agree that the transfer of a going concern implicitly entails the transfer of trademarks and other goodwill. *See Speed Prods. Co. v. Tinnerman Prods.*, 179 F.2d 778, 782 (2d Cir. 1949) ("The goodwill of the business, though unmentioned, passed with the transfer of the business."); J. Thomas McCarthy, 3 *McCarthy on Trademarks and Unfair Competition* § 18:37 (4th ed. 1994) ("When a business is sold as a going concern, trademarks and the good will of the business that they symbolize are presumed to pass with the sale of the business."). This has been called an "old and clear rule," 3 *McCarthy on Trademarks* § 18:37, and its longevity is due to its logic. The contrary proposition—that the names "Kehot" and "Kehot Publication

6

Society" were assigned to Merkos, but the logo bearing the very same words (in Hebrew) were not—is untenable. *Cf. Oklahoma Beverage Co. v. Dr. Pepper Love Bottling Co.*, 565 F.2d 629, 632 (10th Cir. 1977) ("[T]he trial judge correctly found that 'trade name' used in the contract meant 'trademark.'").

Vaad objects that the resolution reflects only a transfer of the "right to use" the name Kehot and is, therefore, more a license than a transfer of ownership. That interpretation, however, is belied by the overwhelming evidence that Kehot, as an entity, was folded into Merkos, which has now run its publishing operations for more than 70 years. In that role, it took steps to protect the logo by registering it under New York law. To be sure, the Rebbe served as Merkos's president and played a major role in its management. But that role merely underscores that the steps he took to formalize the operation of Kehot was something more than a license to use its name. *Cf. Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979) ("Where . . . the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief [against his continued use of the name] is more tolerable.").

In sum, the TTAB's finding that Merkos owned the Kehot logo was supported by substantial evidence. Indeed, even without giving any deference to that finding, the Court would reach the same conclusion as a matter of law.

**B. What is the Kehot logo?**

The function of a trademark is "to identify and distinguish goods . . . and to indicate their source." *American Express Co. v. Goetz*, 515 F.3d 156, 159 (2d Cir. 2008) (citing 15 U.S.C. § 1127). Another type of mark—known as a certification mark—is used "to certify

regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of [goods or services]." 15 U.S.C. § 1127. Thus, "[o]ne who sees a certification mark on a product or in connection with a service is entitled to assume that that product or service in fact meets whatever standards of safety or quality have been set up and advertised by the certifier." 1 *McCarthy on Trademarks* § 4:15. An example—particularly apt in this case—are the various *hechsherim* used to certify that food products comply with Jewish dietary laws.

Vaad argues that the Kehot logo is a certification mark. The parties dispute whether this argument was raised in the administrative proceeding. The term "certification mark" does not appear anywhere in the briefing or the TTAB's decision. On the other hand, Vaad argued throughout the proceeding "that the Kehot logo represents something spiritual, namely that the Rebbe has sanctioned the use material identified by the logo." *Vaad*, 2010 WL 3597243, at *8. In response, the TTAB reasoned that "[o]wnership of a trademark gives the owner the right to determine what goods will be sold or offered under the mark" and, therefore, that the Rebbe's "actions in approving the use of the logo are no different from any other trademark holder." *Id.*

In the Court's view, Vaad's argument to the TTAB is a certification mark argument in all but name. But, as with the ownership issue, the standard of review is immaterial because the Court would reject the argument even on *de novo* review.

Vaad lays heavy emphasis on the undisputed fact that placement of the Kehot logo on any publication required the Rebbe's approval. But the Court is in complete agreement with the TTAB that a similar approval process is to be expected for any

8

trademark. Nor does it follow that allowing Vaad and others to use the logo made it a certification mark. "[Trademark] licensing is permissible provided the licensor retains some degree of control over the quality of the goods or services marketed thereunder." *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 300 (S.D.N.Y. 2000) (citing *Dawn Donut Co. v. Hart's Food Store, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)). Indeed, allowing others to use a mark *without* a quality approval process—what trademark law calls a "naked license"—risks abandoning the mark's source-identifying function altogether. *See id.* ("A licensor must exercise some degree of supervision over the licensee on pain of abandonment of the mark, a result that never is in the licensor's and rarely in the licensee's interest." (footnote omitted)). In the context of this case, it is hardly surprising that the approval process would be carried out by the founder of both Kehot and Merkos and the spiritual leader of the Lubavitcher community during his lifetime. Nor is it surprising that others at Merkos would have to take over the approval process upon the Rebbe's passing. Whatever ultimate account Merkos's current management must make to the Rebbe for their actions is beyond the Court's competence to adjudge.

If the Rebbe's approval does not conclusively answer whether the Kehot logo is a trademark of a certification mark, then what does? Once again, the Court finds the words of the logo itself dispositive. To anyone who reads Hebrew—and it is safe to assume that most, if not all, in the relevant market do—the logo announces that a publication bearing it emanated from a "publishing house" called "Kehot." That is the very essence of source identification. Thus, the Court concludes, as a matter of law, that the logo is a

9

trademark.[1]

### III

Having determined that Merkos owns the Kehot logo, and that the logo is a trademark, the Court now turns to Merkos's counterclaims that Vaad's continued use of the mark is unlawful. Vaad offers two reasons why it is entitled to summary judgment on those claims. First, it argues that the claims are barred by the doctrine of laches. Second, it argues that Merkos cannot recover money damages. The Court addresses those contentions in turn.

**A. Laches**

Because trademark infringement is a continuing wrong, "a statute of limitations is no bar except as to damages beyond the statutory period." 6 *McCarthy on Trademarks* § 31:1. Thus, "it is almost always laches, not the statute of limitations, that is invoked to determine the availability of both injunctive and monetary relief." *Id.* Without

---

[1] A conclusion that the Kehot logo was a certification mark would entail some bizarre consequences. The owner of a certification mark cannot "engag[e] in the production or marketing of any goods or services to which the certification mark is applied." 3 *McCarthy on Trademarks* § 19:92. Instead, the owner's role is to decide which good and services can bear the mark. If the Kehot logo were a certification mark, Merkos could not use the logo on its own publications, but could withhold approval for its use on Vaad's publications. Thus, Vaad's argument makes it the proverbial dog in a manger:

> A DOG was lying in a manger full of hay: An Ox, being hungry, came near and offered to eat of the hay; but the envious ill-natured cur, getting up and snarling at him, would not suffer him to touch it: Upon which the Ox, in the bitterness of his heart, said, "A curse light on thee for a malicious wretch, who wilt neither eat hay thyself, nor suffer others to do it."

Samuel Croxall, *Fables of Aesop and Others* 219 (London, A. Millar, W. Law & R. Cater 1722).

that defense, "a plaintiff could delay filing suit indefinitely." *Id.*

To prevail on a laches defense, the defendant must show "that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir. 1980) (quoting *Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1096 (S.D.N.Y. 1978)). When the delay is longer than the analogous statute of limitations, "a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). The analogous limitations period here is New York's six-year period for fraud claims. *See id.* Since Merkos's delay is substantially longer—17 years elapsed between its 1994 letter to Vaad and the assertion of its counterclaims—Vaad is entitled to the presumption.

Merkos argues that laches ought not to bar its counterclaims for two reasons. First, it notes that laches is not a defense to intentional infringement. *See, e.g., Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). Intentional infringement is infringement done in bad faith to confuse consumers or trade on the plaintiff's goodwill. *See id.* ("[The infringers] intentionally traded off the Hermès name and protected products and should not have been entitled to invoke the doctrine of laches . . . ."); *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 813 (2d Cir. 1999) ("[The infringer's] intention to confuse undermines any claim of good faith . . . .").

On the facts of this case, Vaad has a colorable claim that it continued to use the

11

Kehot logo in the good-faith belief that the Rebbe's prior approval entitled it to do so. The Court cannot rule out, however, the alternative theory that Vaad intended to sow confusion as to the source of its publications after the Rebbe's passing. In other words, Vaad's good faith presents a question of fact.

The infringer's good faith presents "a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities." *Hermès Int'l*, 219 F.3d at 107. Thus, if the factfinder were to find that Vaad acted in bad faith, its laches defense would fall out of the picture. This means that Merkos's second argument—that its delay was occasioned by litigation against other infringers—must also await resolution. The Court notes, however, that the excuse, if accepted by the factfinder, is a valid one. *See* 6 *McCarthy on Trademarks* § 31.16 ("A trademark owner is not bound to take on more than one infringer at a time." (quoting *Cuban Cigar Brands*, 457 F. Supp. at 1097 n.28)). Although Vaad points out that Merkos did not initiate any other litigation until 2001—after the six-year period had run—Merkos is, at this stage, entitled to the reasonable inference that at least some preparation for the litigation fell within the period.

**B. Money Damages**

Consumer confusion is the cornerstone of trademark infringement. Injunctive relief—"the usual and standard remedy," 5 *McCarthy on Trademarks* § 30.1—is appropriate when there is a *likelihood* of confusion; such a likelihood exists, as a matter of law, "when a junior user has affixed a senior user's mark to 'substantially identical products directed at the same market and sold through the same outlets.'" *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d

12

960, 966 (2d Cir. 1981) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47-48 (2d Cir. 1978)).[2]  To recover damages, by contrast, a plaintiff must show either "actual consumer confusion or deception resulting from the violation," or "or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion."  *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992).

As noted, whether Vaad engaged in intentionally deceptive conduct presents a question of fact.  Therefore, the Court cannot say, as a matter of law, that Merkos is limited to only injunctive relief.

## IV

The PTO's decision approving Merkos's application for registration of the Kehot logo as a trademark is affirmed.  Accordingly, Vaad's motion for summary judgment is denied in that respect, while Merkos's cross-motion is granted.  With regard to Merkos's counterclaims, Vaad and Chanin's motion for summary judgment is denied.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 29, 2013

---

[2] Although it appears that Vaad's use of the Kehot logo creates a likelihood of confusion as a matter of law, Merkos has not moved for summary judgment on its claims for injunctive relief.  In any event, the issue of fact regarding the availability of a laches defense would preclude summary judgment on those claims.  *See Saratoga Vichy Spring, Inc.*, 625 F.2d at 1041 (rejecting argument that "in trademark suits the defense of laches is not available to defeat equitable claims for an injunction").