UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
VAAD L'HAFOTZAS SICHOS, INC.,

    Plaintiff/Counterclaim Defendant

    -against-                        **MEMORANDUM AND ORDER**
                                              10-CV-4976 (FB) (JO)
KEHOT PUBLICATION SOCIETY, a
division of MERKOS L'INYONEI
CHINUCH, INC.,

    Defendant/Counterclaim
    Plaintiff/Third-Party Plaintiff,

    -against-

ZALMAN CHANIN,

    Third-Party Defendant.
---------------------------------------------------x

*Appearances:*
*For the Plaintiff/Counterclaim Defendant*    *For the Defendant/Counterclaim*
*and Third-Party Defendant:*                               *Plaintiff/Third-Party Plaintiff*
MITCHELL C. SHAPIRO                            J. CHRISTOPHER JENSEN
BRANDON JON ISAACSON                      Cowan, Liebowitz & Latman, P.C.
Carter Ledyard & Milburn LLP                  1133 Avenue of the Americas
2 Wall Street                                                           New York, NY 10036
New York, NY 10005

**BLOCK, Senior District Judge:**

       Since the passing of Rabbi Menachem Mendel Schneerson (the "Rebbe"), a religious dispute has divided the Chabad Lubavitch community. A minority of the community, including counterclaim defendants Vaad L'Hafotzas Sichos, Inc. ("Vaad") and Zalman Chanin, holds the belief that the Rebbe is the Messiah and still lives. This messianic belief

has caused a rift that has spawned a spate of litigation. The Court has previously been called upon to decide whether an individual who believed the Rebbe was the Messiah could publish an altered edition of a book of the Rebbe's letters, *Merkos L'Inyonei Chinuch, Inc. v. John Doe Nos. 1-25*, 172 F. Supp. 2d 383 (E.D.N.Y. 2001), whether the Patent and Trademark Office ("PTO") properly registered the Kehot Publication Society logo as a trademark owned by Merkos L'Inyonei Chinuch ("Merkos"), *Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y*, 935 F. Supp. 2d 595 (E.D.N.Y. 2013), and whether Vaad held the copyright to various works of the Rebbe, *Vaad L'Hafotzas Sichos, Inc. v. Krinsky*, – F. Supp. 3d –, 2015 WL 5719826 (E.D.N.Y. Sept. 30, 2015), *appeal docketed*, No. 15-4186 (2d Cir. Dec. 29, 2015).

Now before the Court is the residual issue undecided in the *Vaad* trademark case. There, the Court granted partial summary judgment in favor of Merkos, affirming "[t]he PTO's decision approving Merkos's application for registration of the Kehot logo as a trademark." 935 F. Supp. 2d at 603. In so holding, the Court determined the PTO's decision was supported by substantial evidence. However, the Court denied summary judgment on Merkos's counterclaims for injunctive relief for trademark infringement of the logo under the Lanham Act and under New York law for unfair competition and dilution. It noted that Vaad's use of the Kehot logo "appear[ed]" to create a likelihood of confusion, *id.* at 603 n.2, but no such determination was necessary at the time because Vaad's properly

2

alleged affirmative defense of laches raised factual issues. Accordingly, over the course of four days this past October, the Court held a bench trial to determine whether Merkos could prove its counterclaims and, alternatively, whether Vaad was protected by laches.

Vaad readily admits that it uses the Kehot logo on all of its publications. Merkos would have no objections if Vaad did not omit the appellation "of blessed memory" after references to the Rebbe's name—which is contained in Merkos's publications. Vaad does this consistent with its belief that the Rebbe is the Messiah and still lives. Merkos does not subscribe to this, and takes umbrage at the use of its logo by Vaad because it does not want it to be associated with Vaad's messianic belief; hence, its wish to enjoin Vaad from using the Kehot logo.

While the dispute over the proper way to refer to the revered Rebbe Schneerson since his passing may not resonate in the secular world, it is of vital concern to the Chabad Lubavitch community. The Court respects the deeply held beliefs of the litigants, but must resolve their litigation in accordance with the secular law.

Based on the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, the Court is constrained to deny Merkos's claim for injunctive relief.

# I

Shortly after Rabbi Joseph I. Schneersohn (the "Previous Rebbe") relocated the headquarters of the Chabad Lubavitch movement from Eastern Europe to Crown Heights, Brooklyn, he founded the Kehot Publication Society ("Kehot").[1] A year later, he established Merkos to provide broader educational services to the Lubavitcher community. At its first meeting, in 1942, Merkos's board of directors resolved to take over direction of Kehot, an unincorporated entity. The resolution reads as follows:

> Whereas "KEHOT" has been engaged in the publication of literature of great value both in the religious and pedagogic field, and
>
> Whereas it appears that such activity would well fit into the program of [MERKOS] and it would be for the best interests of [MERKOS] to assume and adopt the continuance of these publications hereafter, and
>
> Whereas RABBI JOSEPH I. SCHNEERSOHN has signified his willingness to and does give and assign to [MERKOS] the right to use the trade names of "KEHOT" and "KEHOT PUBLICATION SOCIETY" in publishing, advertising and distributing religious and pedagogic literature,
>
> Now, therefore, it is resolved that the proposal as set forth above be and the same hereby is approved and the Executive Committee is directed to carry out the terms of this resolution in all respects.

Merkos has since affixed the Kehot logo to almost all of its publications.

During the Previous Rebbe's tenure, several entities apart from Kehot used the Kehot logo. Some, like Kehot, were part of Chabad Lubavitch's umbrella organization; others

---

[1] For a detailed account of the Previous Rebbe's efforts to travel to the United States after the outbreak of World War II and to reacquire the library of the Chabad Lubavitch movement, which had been left behind in Poland, see *Agudas Chasidei Chabad of U.S. v. Gourary*, 650 F. Supp. 1463 (E.D.N.Y. 1987) (Sifton, J.).

were independent. All uses of the logo were contingent on the Previous Rebbe's approval. This practice continued when the Rebbe succeeded the Previous Rebbe in 1951.

In 1958, and again in 1962, the independent Lubavitch Youth Organization published a weekly pamphlet containing the Rebbe's *sichos* (talks or sermons). Vaad was formed in 1967 to centralize the publication and distribution of the Sichos. Indeed, Vaad's full name means "Council for Distribution of the Sichos."

Thus, between 1967 and 1994, Vaad submitted its weekly pamphlets to the Rebbe. Upon receiving his approval, Vaad would publish and distribute the pamphlets under the Kehot logo. In addition, in 1979, the Rebbe put Vaad in charge of some of Kehot's printing operations.

The death of the Rebbe in 1994 caused a leadership crisis in the Chabad Lubavitch community. Rabbi Yehuda Krinsky took over direction of Kehot and Merkos, but no one acceded to the position of Rebbe. Notwithstanding the Rebbe's passing, Vaad did not include the "of blessed memory" appellation in its next publication.

Weeks after the Rebbe's death, Rabbi Krinsky and Nissan Mindel, both members of Merkos's board, sent a letter to Vaad. The letter chastised Vaad for omitting the appellation after the Rebbe's name in its publications. Thereafter, Vaad published the Rebbe's name with the appellation for approximately one year, but then resumed publishing without it. On July 13, 1995, Rabbi Krinsky and Mindel sent Vaad another letter that stated (translated from Hebrew):

> We were stunned to see that you altered the idiomatic expression which was coined by the holy Rebbe, . . . and you began printing the Likkuti Sichos by omitting, on the title page, the terms customarily applied after his holy name.
>
> We have already written to you a year ago, and we warned you that in such circumstance you should not play with these types of things. We fervently protest against this dreadful act, and it is a profanation of his [the Rebbe's] honor, G-d save us, and it causes the opposite of disseminating his wellsprings, G-d forbid. It has already become publicly known that, thanks to your serious behavior, you have accomplished that a good many of our Jewish brethren refrain from studying the Sichos, G-d forbid.
>
> We warn you that you <u>immediately</u> repair this in the next pamphlet.

Merkos Exh. 52.

Despite the letter, Vaad continued to publish the Rebbe's name without the appellation.

In September 2001, Merkos applied to the PTO for the registration of the Kehot logo as a trademark for use on "books, magazines, charts, maps, and photographs on a variety of aspects of Jewish life." *Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y*, 2010 WL 3597243, at *1 (TTAB Aug. 30, 2010). Vaad timely "opposed" the application. The matter was referred to the PTO's Trademark Trial and Appeal Board ("TTAB"), which "dismissed" Vaad's opposition in a 2010 written opinion, when it granted Merkos's registration application.

## II

"To prevail on a Lanham Act infringement claim, a claimant must show that 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause

6

confusion.'" *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 138 (2d Cir. 1999) (quoting *Cadbury Beverages, Inc. V. Cott Corp.*, 73 F.3d 474, 477 (2d Cir. 1996)); *see also* 15 U.S.C. § 1125; *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). The Court affirmed in its prior opinion that Merkos is the owner of the Kehot logo, which is indeed a trademark. Moreover, nothing was presented at the bench trial to countermand the Court's determination that there was substantial evidence to support that conclusion.[2] Accordingly, whether Merkos can set out a valid infringement claim under the Lanham Act depends on whether it has shown that Vaad's use of the Kehot logo is likely to cause confusion.

To resolve this issue, the Court must apply the eight-factor balancing test introduced by the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The factors are: "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that

---

[2] Even if such evidence were presented, it is likely the TTAB's decision would have had preclusive effect. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1310 (2015) (holding that in an infringement action, "when the usages adjudicated by the TTAB are materially the same as those before the district court, issue preclusion should apply"); *see also* Wright and Miller, 18A Federal Practice and Procedure § 4433 (2d ed. updated 2015) ("[I]t is . . . held in federal courts that the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided."). The Court need not decide the preclusion issue because the Court's disposition of the case would remain unchanged.

7

the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp.*, 588 F.3d at 115.

**Strength of the Mark**

The first factor—the strength of the mark—"is determined by its tendency to uniquely identify the source of the product." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005). The Second Circuit has analyzed this factor in two steps. First, the Court must analyze "whether the mark has the inherent distinctiveness that would entitle it to protection in the absence of secondary meaning. Marks are classified, in ascending order of strength, as '(1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful.'" *Id.* at 384–85 (alteration in original) (quoting *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)). Second, the Court must consider "the inherent inventiveness of the mark itself and the amount of third-party usage of the [mark], especially in the market in question." *Id.* at 385 (quoting 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:81, at 11:159 (2005)).

The Kehot logo is an original image and is thus fanciful and inventive, however, the logo has been and continues to be used by numerous entities other than Merkos in the production of books for sale in the Hasidic community.[3] *See* Vaad Exhs. O – U (title pages of books bearing Kehot logo and statement that the books were published by Agudas Chasidei Chabad Worldwide, Machne Israel, The Secretariat of the Rebbe, or United

---

[3] The Hasidic community is a population of Orthodox Jews that includes the Chabad Lubavitch community, as well as others.

8

Lubavitcher Yeshivoth); Merkos Exhs. 23, 43–45 (same published by Otzar Hachasidim); Tr. Trans. 369:8–372:21 (testimony of Yaakov Chazan identifying many other organizations that publish using the Kehot logo). This evidence demonstrates that the logo does not provide strong source identification for Merkos. Accordingly, this factor does not weigh in Merkos's favor.

**Similarity of the Marks**

The second factor—the similarity of the marks—weighs in favor of finding a likelihood of confusion because the logos used by Merkos and Vaad are identical.

**Proximity and Competitiveness of Products**

Similarly, the third factor—the products' proximity and competitiveness—also weighs in favor of finding a likelihood of confusion. The books sold by Merkos and Vaad are identical except for the omission of the appellation after the Rebbe's name in Vaad's publications, and Vaad and Merkos target the same market, the Hasidic community.

**Bridging the Gap**

The fourth factor—evidence that Merkos might "bridge the gap"— does not apply because the products are in competitive proximity.[4] *See Star Indus.*, 412 F.3d at 387 ("Because . . . Star's and appellees' products are in competitive proximity, there is really

---

[4] "'The term "bridging the gap" is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields.' Thus, the issue is not whether there is a competitive overlap in the goods or services of the contesting parties: the test is the degree of proximity of the goods or services." 4 MCCARTHY ON TRADEMARKS § 24:18 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985)).

no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case.").

**Evidence of Actual Consumer Confusion**

Merkos has offered little in support of the fifth factor—evidence of actual consumer confusion. It adduced six emails received from prospective customers to the Kehot customer service email address asking questions related to books published by Vaad. The relevant portions of the emails are quoted in the margin.[5] In addition, Rabbi Joseph Friedman, a Merkos director, testified that Merkos has received many more emails similar to the ones in evidence.

However, the probative value of these emails is limited. Their authors did not testify and we do not know what caused them to believe Merkos was the publisher of Vaad publications. *See, e.g.*, *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*, 616 F. Supp. 370, 388 (S.D.N.Y. 1985) ("The declarants themselves did not testify; thus in most cases we do

---

[5] (1) "I'm working on an auction booklet for the camp fund . . . and I wanted to know if you could supply us with the following hi-res photos: [1] Set of Igros Kodesh/Sichos Parshios [2] Talks and Tales."
(2) "I'm interested in purchasing the likutei sichos parshios from you but I don't see it online do you have it in stock?"
(3) "I saw a 10 volume set of the rebbe's sichos organized by the parsha in english. do you have that set? If so, please send a link to order from your website."
(4) "Hi, do you have the Likkutei Sichos translated to hebrew, the first 4 volumes? And do you ship it to Manhattan? How much would it be?
(5) "How much does a set of igros cost with shluchim discount? Also do you sell set of likutei sichos set up according to parshos? If so how much is it with shluchim discount?
(6) "Do you have Likutei Sichos, by the parsha? What about Igros Kodesh?"
Merkos Exh. 97.

not know why they asked what they asked or said what they said. . . . The probative value of such declarations is reduced by uncertainty as to what induced them. In a case where the issue is whether defendant's mark caused confusion, the relevant question is what induced the state of mind revealed by the declaration." (internal quotation marks and alterations omitted)). While it is *possible* the customers' confusions in their emails were caused by Vaad's use of the Kehot logo, it is also possible that they were confused because Merkos publishes books very similar to the ones inquired about in the emails. For example, five of the emails asked for the Likkutei Sichos organized by the parsha (the weekly Torah portion). While Merkos does not offer the Likkutei Sichos organized by parsha, Merkos does publish the Likkutei Sichos. Any confusion reflected in the emails could stem from the fact that Merkos and Vaad are publishing identical books—other than the appellation—and not necessarily from Vaad's use of the Kehot logo.

In further support of Merkos's claim of actual consumer confusion, Rabbi Mendel Sharfstein testified that individual members of the Hasidic community are "reluctant to interact with [him] and the activities that [he is] involved in for Merkos," Tr. Trans. 272:1-2, if they think Merkos believes the Rebbe is the Messiah. This testimony, however, similar to the emails discussed above, does not compel the conclusion that such confusion was caused by Vaad's use of the Kehot logo. The internal dispute about whether the Rebbe is the Messiah is well-known throughout the Hasidic community, and it is likely that individuals in the community would inquire as to Merkos's beliefs regardless of whether

11

Vaad used the Kehot logo.

Accordingly, because it has not adduced sufficient evidence of actual consumer confusion, this factor weighs against Merkos.

**Bad Faith**

The sixth factor—whether Vaad adopted the Kehot logo in bad faith—was the most hotly contested. "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388.

Merkos argues that bad faith is demonstrated by Vaad continuing to publish with the Kehot logo after it had received the two letters from Merkos—one in 1994 and one in 1995—chastising it for omitting the appellation after the Rebbe's name. It also contends that Vaad acted in bad faith because it had prior knowledge of Merkos's use of the Kehot logo. *See, e.g.*, *Star Indus.*, 412 F.3d at 389 ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.").

However, although the letters from Merkos to Vaad indicated that members of Merkos were outraged by the omission of the appellation and instructed Vaad to "immediately repair this in the next pamphlet," they did not demand that Vaad cease publishing under the Kehot logo. In fact, the letters make no mention of the Kehot logo. Considering Vaad's longstanding permission and practice to publish under the Kehot logo, Vaad's disregard of Merkos's instruction to include the appellation does not necessarily

establish that from that point forward it was intentionally infringing upon Merkos's trademark.

Moreover, Vaad's decision to continue publishing was based on its belief that the Rebbe granted Vaad permission to use the Kehot logo and that Merkos did not have the authority to alter the Rebbe's instructions. Even assuming Vaad's belief was mistaken, this does not translate to bad faith. *Cf. United States v. Rivera*, 25 F. Supp. 2d 167, 173 (S.D.N.Y. 1998) (finding an "honest, though mistaken, belief" precluded "a finding of bad faith").

Accordingly, Vaad did not adopt the Kehot logo in bad faith.

**Quality of the Products**

Because the books are identical, except for the appellation, the seventh factor—the respective quality of the products—weighs in favor of finding a likelihood of confusion. *See Morningside Grp. Ltd. v. Morningside Capital Grp.*, 182 F.3d 133, 142 (2d Cir. 1999).

**Sophistication of Consumers**

Analysis of the eighth and final *Polaroid* factor—the sophistication of the consumers—considers "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996). The only evidence related to this factor was obtained upon questioning by the Court when Rabbi Krinsky candidly admitted that "those who are

13

interested in the Hasidic life," Tr. Trans. 233:12-13, are aware of the present litigation and that there "are many savvy enough" in the community to recognize the difference between a Vaad and Merkos publication. Tr. Trans. 157:11. Therefore, this factor does not weigh in favor of Merkos. *Cf. Starbucks Corp.*, 588 F.3d at 119 ("Given the lack of evidence provided to the District Court regarding consumer sophistication, we decline to give this factor 'much, if any, weight.'" (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78–79 (2d Cir. 1988))).

**Balancing the Factors**

Three factors weigh in favor of finding a likelihood of confusion (similarity of the marks, proximity and competitiveness of the products, and respective quality of the products), three factors weigh against (strength of the mark, evidence of actual confusion, and bad faith), and two factors (bridging the gap and consumer sophistication) are inapplicable or not worthy of much, if any, weight. The Court assigns significant weight to the fact that the mark's source identification was never strong because numerous organizations have been publishing under the Kehot logo since the 1940s. Moreover, Merkos did not provide convincing evidence of actual consumer confusion in the face of Vaad's unauthorized use of the logo spanning over twenty years. These two factors, when added to the Court's conclusion that Vaad did not act in bad faith, outweigh the fact that Vaad publishes with the identical logo, on identical products—except, once again, for the appellation—in the same market.

14

Accordingly, since Merkos has not carried its burden of demonstrating that there is a likelihood of confusion, it has failed to prove its claim for trademark infringement under the Lanham Act.

**III**

Even if Merkos demonstrated that there was a likelihood of confusion, it would still not be entitled to injunctive relief under the doctrine of laches.

The Court, in its opinion affirming the TTAB decision, determined that Vaad is entitled to a presumption of laches because of Merkos's delay in bringing its infringement action against Vaad. *Vaad L'Hafotzas Sichos*, 935 F. Supp. 2d at 602 ("The analogous limitations period here is New York's six-year period for fraud claims. Since Merkos's delay is substantially longer—17 years have elapsed between its 1994 letter to Vaad and the assertion of its counterclaims—Vaad is entitled to the presumption." (citation omitted)). Merkos attempts to overcome the presumption by demonstrating that its delay in bringing suit against Vaad was reasonable under the circumstances.

First, Merkos argues that the date it filed its counterclaim against Vaad should not be the operative date. Instead, it points to October and November 2001, when it initiated litigation against two other alleged infringers of the Kehot logo. But even if the Court adopted this date, it would still be more than six years after Merkos sent the July 1995 letter warning Vaad that its next publication must include the appellation after the Rebbe's name.

Merkos asserts that the time between the letter and the commencement of litigation

against other infringers should not be counted against it because the extent of Vaad's infringement expanded in 1998. Specifically, Merkos references the change on the title page of Vaad publications that originally stated "Published and Copyrighted by 'Kehot' Publication Society" to "Published and Copyrighted by Vaad L'Hafotzas Sichos." But Vaad's change to the title page cannot be characterized as an escalation of infringing activities; if anything, clearly identifying a book as being published by Vaad could only help reduce consumer confusion. *Cf. ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopoedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) ("The doctrine of progressive encroachment . . . focuses the court's attention on the question of whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks.").

Merkos also notes that during the period between the 1995 letter and the 2001 litigation, there was occasional communication between Merkos and Vaad that indicated Merkos's disapproval of Vaad's publications. The record was not developed with respect to these conversations, and notwithstanding, courts have previously required more than negotiations to excuse a delay. *See, e.g.*, *Charvet S.A. v. Dominique France, Inc.*, 586 F. Supp. 470, 475 (S.D.N.Y. 1983) ("[I]t is fatuous to suggest that year in and year out desultory conversations, some occurring during chance meetings, which achieve no result and with each party adhering to its position, excuses delay.").

16

Unable to overcome the presumption, Merkos argues that Vaad is not entitled to the laches defense because Vaad acted in bad faith by intentionally infringing on the Kehot logo. *See Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) ("It is well established that laches is not a defense against injunctive relief when the defendant intended the infringement. This good-faith component of the laches doctrine is part of the fundamental principle that he who comes into equity must come with clean hands." (internal quotation marks and citations omitted)). As described in detail in the section above, Vaad acted in good faith when it continued to publish under the Kehot logo in a manner it believed was consistent with the Rebbe's directives.

Accordingly, even if Merkos established a prima facie case of trademark infringement, laches would preclude injunctive relief.

## IV

Because the Court has determined that Vaad did not act in bad faith or in a deliberately misleading manner, Merkos's claims of unfair competition under New York common law and New York General Business Law § 349 fail. *Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F. Supp. 2d 382, 395 (S.D.N.Y. 2006) ("To prevail on a claim for unfair competition under New York common law, a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith." (internal quotation marks omitted)); *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) ("A plaintiff under section 349 must prove three elements: first, that

17

the challenged act or practice was consumer-oriented; second, *that it was misleading in a material way*; and third, that the plaintiff suffered injury as a result of the deceptive act." (emphasis added)).

Merkos also brings a claim for dilution under New York General Business Law § 360-l. The statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

New York Gen. Bus. Law § 360-l. The Court of Appeals has construed the statute to apply to only those marks "which are truly of distinctive quality or which have acquired a secondary meaning in the mind of the public." *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 42 N.Y. 538, 546 (1977). The Second Circuit has held held that the statute "protects only extremely strong marks." *Bristol-Meyers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir. 1992) (quoting *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983)).

As the Court analyzed when considering the factors for Merkos's infringement claim, the strength of the Kehot logo as a source-identifying mark is greatly diminished by the fact that numerous entities have published under the mark from the 1940s until today. The Court cannot conclude that it is an "extremely strong mark" warranting protection under § 360-l. *See id.*

# V

For the foregoing reasons, the Court dismisses Merkos's counterclaims. This memorandum and order, in conjunction with the Court's grant of summary judgment to Merkos on Vaad's appeal of the TTAB's decision, disposes of all the claims brought in this case. The Court hopes that the parties and the Chabad Lubavitch community can now put an end to litigation over the Rebbe's passing, and let the Rebbe rest—even if only physically—in peace.

**SO ORDERED.**

Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 14, 2016